Thank you, Your Honor, Sarah Moore for the video. In this case, the ALJ determined that despite severe impairments of neck and back pain, Ms. Washington could perform a full range of media work and no non-exertional limitations whatsoever, and could return to her past relevant work as a clerk, cashier, and insurer. All types of media ALJ found that she was not disabled, based on a few complications, including medical-patient guidelines, externalizers, or limitations of dimensions. Yet, as although her external jobs meant that she never worked, Ms. Washington realized that she could follow any of the jobs that she had, and as such, the ALJ's past work findings did not dissipate. The ALJ rarely stated that she had these past jobs, and that she could read and write all of the documents on record, and carry her detailed explanation of her past relevant work, but did not have evidence to show that her current use of external, exceeded presumptive SJ amounts, and it's likely that that's what Ms. Washington performed. And yet, in an insurgent's lowest case analysis of presumption, that we have earnings that are underneath the SJ level, the burden that goes to the ALJ to prove that there's substantial evidence that shows that aside from the first half of the age that's in SJ, and we submit that the earnings, right when it's on page 77 of the record excerpts, only shows two years of earnings, and if you, this is 2005-2006, and if you average those by the average age of the years, you do not show that you reached the SJ level. Now, the clips you're pointing out in your brief, those MIPS 2006 jobs, Ms. Washington essentially worked for nine months, and so that you took that amount and divided it by nine, to where the terms are showing earnings in all four quarters. This is a sheet of paper that shows each quarter. It does show that there's no detailed earnings in the series. In most cases, the outcome is new, and it's a detailed earnings. And yet, the main change in request is that information from every job that Ms. Washington performed, and there's no information from the jobs, from the employers themselves, and then the case would be remanded for the developer record regarding whether the past work was in fact performed at the SGA level. Secondly, they chose a judgmental type of finding, that if Ms. Washington could not return to her past jobs, that those alternative works could perform and apply to the medical location guidelines. Finally, she was not disabled, and despite these all findings, she had her limitations, moderate limitations, concentration, persistence of grace, and despite the fact that the record includes a state agency medical consultant who found she had limited overhead reach, that the ALJ never discussed this. This doctor, this doctor later, who reviewed the case back in March 2008, a state agency medical consultant, and said Ms. Washington was under exceptional occasional reaching over her secondary term at the SGA, and she didn't even realize all of the extra, so January 2007 is still a record, and so since 2012, and another doctor in October 2008 reaffirmed these findings that she had limited overhead reaching. MS. WASHINGTON. Ms. Washington had a question featuring that as a non-exceptional concessional. MS. WASHINGTON.  It's a non-exceptional concessional because that's a medical location that's a certain way you've got to be able to perform meeting work, which is a table face down, a chair face down, and so on to do meeting work, which can be 25 miles frequently, 50 miles occasionally, standing and walking six out of eight hours a day, and you can reach your arms over here at a significant, non-exceptional location. Another doctor that was referenced by the state agency doctor said MRI of her cervical spine is another record. On page 247, it shows significant MRI. This was done in September of 2008, MRI of the cervical spine. It shows she had degenerative changes at C4 and 5, C5 and 6, C6 and 7. She has neural four-mile encroachment with moderate breast and mild right side at C4 and 5, and also large breast and middle right at C2 and C7. This is another MRI of her cervical spine. It also shows abnormalities at C4 and 5, C5 and 6. This is in the record at page 254. Actually, our appointees, we have a chart, and we did a lot of CTR in page 20, which shows the abnormalities at C6, at your shoulders, at your ability to move your shoulders, and that, of course, is reaching the limitation that was noted by the state agency doctor. Now I'll turn your attention to the Gruden case. It's cited in our briefing. It's a case that deals with allergies to medical location guidelines. It's Gruden v. McNair, a 2001 case, and in that case there's also a limitation to the person's not work at or above shoulder level, and the officer detailed that because Gruden may have dysmorphatic hair, the commission cannot rely on the correctness. Instead, the commission has to rely on the testimony of the location expert to determine under Step 5 of the Five Steps to Breast Fevering whether Gruden is capable of performing better jobs in the next economy. So we believe that this limitation was noted, but the ALJ never mentioned these case findings, that the doctor would have at the shoulder of the person. It's in translations. They have a category. We would expect that the non-exercial limitations are, and it's referenced in this regulation. CFR 416.969A subpart C, this non-exercial limitation, we want to suggest that the person is performing manipulative or functional functions for some work, which is reaching, handling, stooping, climbing, crawling, or crouching. So we see that it's a non-exercial limitation, and, of course, the CFR is harmless error. The jobs would have mattered, because of course reaching is not saying it's reaching in any direction, but certainly we did mention in our supplemental materials that you can find later in the week, and I direct your attention to the Marsh versus Fulton cases from last year. They talked about harmless error, and said that the ALJ's silent or successful series was silent in our assessments. The ALJ's silent disregard of limits this morning was not harmless, and we explained that ALJ errors associated with cases are harmless if they are, quote, inconsequential to defaults and non-disability determination, and the reviewing court should not consider any are harmless. And this was when the competition concluded that no reasonable ALJ of full-threaded and accessible records reached interpretability determination. So no reasonable ALJ would have found that something did not reach overhead, and this was the Fulton case that is a non-exercise limitation. It's strict upon the full range of work, and the ALJ never addressed that. The ALJ also fails to acknowledge that all limitations and concentration persist in cases that set moderate limitations and concentration persists in cases, and yet still has heard a lot of the moderate or subordinated tasks, which, as you may have heard earlier, have no mental limitations at all, and that's another reason that the ALJ finding that she could perform other work based on the manifold application of grids should not be sustained. Thank you. So now we're going back to our report. There's a lot of questions about social implementation. We want to make sure that this is actually a complete and comprehensive report that considers all work-related limitations or assumptions, and it's not defined by individual standards. It equals all of the features, Most of the cases that are cited by the commission talk about sedentary jobs, The cases that are cited in the commissioner's brief talk about white sedentary jobs, breathing cases, median funding, median working hours, terminals, split the choir, median jobs or jobs, Therefore, overhead work is more important than that kind of work, and hard work and wages defined as reaching up to $285,000, $8,515,000, reaching $8,000,000. The implementation of social implementation needed to be considered by a vocation expert. The commissioners are sitting there right now. That's correct. And Mr. McHale should provide a vocation expert to provide testimony on whether some of the implementations should be considered work. And I think that's a good point. Thank you. I think it's also a good point for how we put this together Yes. As I just mentioned, the implementations need to be changed. And I think Mr. McHale should be able to refer to some of the implementations. It would be rather difficult for the fine-finer regarding the task work as well as the other work. The other issue that was raised is the judge. One of them is the failure to provide proper reasons for making subpoenas in the case. A low-priced oral imitation found by the ALJ became one of the three reasons for exempting the ALJ. One of the relevant reasons along with Mr. Conceited and the other is the court found this incorrect. The ALJ required a refresh on subpoenas. That's correct. Her on-site date was December of 2006, and the ending was in February of March of 2007. The ALJ was supported by clinical findings from diagnostic studies, which he said was the MRI evidence. As I just mentioned, it was also MRI evidence. The lumbar spine, shoulder abnormalities, the records from her training position at Golden Valley Health Centers also have an MRI date. The health agency said it was never an imitation of motion, and the records from the training provider show how many cases she had reduced range of motion. They were also documented in the report from the consultant's position. The student records also documented that she had fossil strain. They were raised in a one-examination in October 2008, and so, therefore, these records support the doctor's opinion that the ALJ's reasons were not supported by the procedure evidence. And finally, we had arguments regarding obesity, and she documented the ALJ's failure to use the records. The records that she had of just a surgery-deprived individual, she posted about how she documented it in the record. Based on the consultant's position, Alayla did not have the self-efficacy indicators to know the significant evaluation cost. So, again, you can find obesity and severe impairment in this case. Of course, we're going to be interviewing Alayla soon, and as I said, it's an absolute waste of time, and I'd like to thank you, right here, for all you've done to put this case to rest. Alayla, your time is limited. We should be able to do this in a shorter time. Yes, it's one of the cases that's nice to hear. The doctor's findings are fine, and we're happy to have you on the team here, and I'm sure you'll do a good job. I'm going to ask you a few more questions, and then we'll move forward. One of the issues that there's great amount of points in those meetings is that they give us a list of alternatives, and if I can find any errors or problems, they just recommend that you start on that. One of the reasons is that there are some errors, and I think that a decision should be made to start on that, and I'm sure you'll do a good job. I'm happy to discuss with you as we have. All right. Thanks, John. There are three reasons for adjourning the interview. Those are two that seem to be more obvious. You agree? Yes, I do. I think it's either the whole case or part of it, or what are you saying? Well, the two reasons, I think, were well thought through when we presented the conclusion that this is a sequence of military records, so the limitations on sitting here is nowhere. There's no logic or reference from any certain source that is suggesting there are limitations on sitting on these beds. You need to be following her. Often people have seen that when Dr. H. Menon comes in, and Dr. H. Menon is one of those names that she's arranged for tennis. And Dr. H. Menon is, what is it, Dr. H. Menon? Dr. H. Menon, first of all, is the name that she's arranged for normally. And second of all, she's the name that she supports, the name that she arranges for tennis. Normally, it's a foreign institution. And, yes, she is also one of those names that Dr. H. Menon uses as well. It's not consistent with the opinion of the constituents and Republican society, though it did contain some inclusive representation and a highly space-corporated nature. And as a person there, it's not easy not to be helpful, which is one of the reasons our house has been set up. So I just wanted to say a couple of words in regards to that. I do want to very quickly go through some of the points that Dr. H. Menon has made. He has intended to discuss some of the problems, and Dr. Menon has written a record denying the limitations associated with them. But there is no evidence of a training source assessing limitations of function with a specific rule. And whether or not specific rules were come from the VC or something else, we don't know. And it is our stance that it's inappropriate to engage in speculation about the function limitations that may arise from those things. I'm sorry. We don't have those conditions. And I think that's really what we need to bring into this conversation. We need to raise these speculations. They might be a lot different. I just think that this is a valid point, and it's true. It's not subject to a training or a set of self-assessing limitations. And we need to have a conversation about that. And we need to have a conversation about the limitations of function. That's why I'm going to stop here. And thank you, ladies and gentlemen. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you very much.
judges: Reinhardt, Thomas, Christen